G. A. MILLER, W. W. Lord, Ralph Smeed, L. H. Staus and Jack Smeed, Trustees of John W. Smeed Estate, Appellants,

v.

Archie E. CORBARI et al., Appellees.

No. 15796.

United States Court of Appeals Ninth Circuit.

July 10, 1958.

Rehearing Denied Aug. 15, 1958.

Pike & McLaughlin, Reno, Nev., Carver, McClenahan & Greenfield, Boise, Idaho, Smith & Ewing, Lawrence N. Smith, Caldwell, Idaho, for appellants.

John S. Halley, Reno, Nev., Forrest E. Macomber, Stockton, Cal., for appellees.

Before ORR, POPE and HAMLEY, Circuit Judges.

ORR, Circuit Judge.

This is the second time around for this case. On its first appearance here this Court disposed of the appeal by remand to the District Court with instructions to find whether or not appellee Sam Wahyou had sustained the burden of proof placed upon him that his purchase of certain stock of the Diamond-S Ranch Co. was fair, the finding to be made on the basis of the evidence then in the record or any additional evidence the parties might offer. Pursuant to the mandate the trial court heard further evidence and at the conclusion thereof made additional findings.

Appellants appeal from a judgment based on said findings, upon the sole ground that the evidence is not sufficient to support the findings. For an understanding of the issues we incorporate herein the statement of facts as set forth in the original opinion.

"The Diamond-S Ranch Co. was incorporated in 1945. Corbari and Wahyou were both stockholders and directors. In 1947, Corbari executed a note which was assigned to the Bank of America in Stockton, California. In 1949, Corbari pledged his stock to secure this indebtedness. He executed a renewal note secured by his pledge agreement on July 10, 1950.

444

"The Diamond-S Ranch Co. was dissolved on September 7, 1950. Section 1665 or the Nevada Compiled Laws provides in part that '[u]pon the dissolution of any corporation * * * the directors shall be *trustees* thereof. * * *.' [Emphasis added.]

"Corbari executed a second pledge of his stock to the bank in Stockton, California, on September 18, 1950. On October 17, 1950, the Bank assigned Corbari's note with the security of the pledge of the Diamond-S Ranch stock to Wahyou, Corbari's fellow shareholder and director.

"On October 31, 1950, Corbari, who was indebted to appellants' testator during his lifetime, assigned to appellants 'all my right, title and interest in and to all of my partnership interest in the assets of a certain partnership formed by reason of the dissolution of Diamond-S Ranch Co., a Nevada corporation, and in and to any profits arising from the operation of said partnership * * *.'

"At a pledgee's sale held on May 21, 1951, Wahyou, the director of the dissolved corporation, purchased Corbari's stock at public auction. On October 10, 1951, an agent was appointed to revive the Diamond-S Ranch Co. Section 1692 of the Nevada Compiled Laws, 1931–1941, requires the consent of 'all the stockholders' for such a revival. Wahyou gave the consent for the interest formerly held by Corbari. The corporation was revived on December 7, 1951." Miller v. Wahyou, 9 Cir., 235 F.2d 612, at page 614.

The crucial finding with which we are concerned is:

"16. That it is true that the said sale was fairly made in accordance with the laws of the State of California relating to the sale of pledged property and fairly conducted, and the Defendant Sam Wahyou has sustained the burden of proving and has proven that there was no fraud or misrepresentation or other unfair means involved in the purchase of said shares by the Defendant Sam Wahyou, and it is true that the transaction whereby the said Defendant Sam Wahyou acquired the Defendant Archie E. Corbari's stock was fair and that the reasonable value of the shares of stock at the time of the purchase thereof by Defendant Sam Wahyou at said sale on May 21, 1951, was nil and that the said shares after the date of purchase and up to the time of the trial of this action were of no value whatsoever."

The record on this appeal, as is usual in such cases, presents conflicting evidence and of course it was the province of the trial court to give credit to and act upon that evidence which it deemed most trustworthy. In crediting the evidence it is apparent that it drew its conclusions from the book value of the Ranch holdings at the time in question and the testimony of witness Nutting in particular.

The financial statements of the corporation were constructed from scattered corporate records by appellee Wahyou's accountant before trial. The value of the land and improvements was carried on the books for the beginning of 1951 at a total of $137,219.14 and for the end of 1951 at a figure of $129,591.12. The statements containing these figures showed the book value of the corporation to be a minus $1770 at the beginning of 1951 [1] and a minus $7,000 at the end of that same year. This decline evidences the fact that the book value of the land and improvements was somewhat less than $137,219.14 on the date of sale and that the book value of the corporation was then less than a minus $1770. If this book value approximates market value, then it is apparent that the price

1. The balance sheet discloses that the assets of Diamond-S Ranch Co. for the year ending December 31, 1950 were $142,577.76 (book value) and the liabilities, including stockholder advances, were $144,347.96.

of $5,500 paid for the 20% interest in the corporation stock by appellee Wahyou at the sale was an adequate one. It is asserted that the land and improvements were substantially underrated in the book value, and that the market value of the land and improvements was greatly in excess of $150,000. This assertion is made to substantiate the contention that the 20% interest in the corporation bought by Wahyou was of a greater value than the price paid by Wahyou for it.[2] There is substantial evidence in the record supporting the conclusion that the land and improvements did not have a market value in excess of $150,000.

Witness Nutting testified that the ranch was worth about $150,000 in 1951. He made this estimate on the basis of a rule-of-thumb calculation, which assumes that the ranch at the time was able to carry 1,000 head of cattle at a value of $150 per head. This rule-of-thumb value as testified to by witnesses for each party was an accepted method of determining land values in the vicinity of the Diamond-S Ranch.

Nutting further testified that about 300 head of cattle could be carried on the ranch's own property, with the balance of 700 carried on lands leased from the government, a railroad and an adjoining private owner. It was stipulated that the carrying capacity of the government lands for 1951 was 1771 animal unit months, or about 350 head for a five month period. The other leased lands would carry 1921 animal unit months, or about 385 head for a five month period. This would give a total of about 1035 head for the grazing period, including the 300 head capacity of the ranch's own property, the 350 head capacity of the government lands and the 385 head capacity of the lands leased from private owners.

In 1951, according to the witness Nutting, no crops except feed in the meadows were grown on the ranch, and it was in a rather dilapidated condition. The witness Wahyou testified that in 1951 about 400–500 acres were planted in alfalfa, but that there were only about 600 head of cattle on the ranch that year, and all of them were sold at the end of the five month grazing period, for the reason that little feed was available in the meadows due to flooding.

The foregoing discussed evidence which appears in the record supports the trial court's findings, it is substantial, and therefore said findings are not clearly erroneous and the judgment must stand.

Affirmed.

2. At the beginning of the year, to show a stock value in excess of $5,500, the holdings would of necessity have been worth on the market more than $166,500: ($137,219.14) plus ($5,500 x 5) plus ($2,000). At the end of the year, they would have had to be worth in excess of $164,- 000: ($129,591.12) plus ($5,500 x 5) plus ($7,000). The testimony would justify the conclusion that the financial position of the corporation did not fluctuate significantly during the period and points up the condition on May 21, 1951.